

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>CASEY LYNN CROW GHOST,<br>Defendant. | 1:21-CR-10003-CBK<br><br>MEMORANDUM OPINION<br>AND ORDER |

Defendant was convicted by a jury of first-degree murder and use of a firearm during a crime of violence that caused death. He has filed a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a) and a motion for a new trial pursuant to Fed. R. Crim. P. 33(a).

**I. Judgment of Acquittal.**

"Federal Rule of Criminal Procedure 29(a) requires a district court to 'enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.'" United States v. Broeker, 27 F.4th 1331, 1335 (8th Cir. 2022). A district court has very limited latitude to grant a judgment of acquittal under Rule 29. United States v. Hassan, 844 F.3d 723, 725 (8th Cir. 2016). The court "must not assess witness credibility or weigh evidence." Id. The evidence must be viewed in favor of the jury's verdict. United States v. Frommelt, 971 F.3d 823, 827 (8th Cir. 2020). "The verdict must be upheld 'if there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt.'" United States v. Espinoza, 885 F.3d 516, 520 (8th Cir. 2018) (quoting United States v. Taylor, 813 F.3d 1139, 1146 (8th Cir. 2016)). "Reversal is warranted only where no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Oliver, 950 F.3d at 565 (quoting United States v. Donnell, 596 F.3d 913, 924 (8th Cir. 2010)).

To convict the defendant of first-degree murder, the government was required to prove, beyond a reasonable doubt, that

      1. Defendant voluntarily and intentionally killed Allison Archambault.

      2. Defendant did so with malice aforethought and not in the heat of passion.

      3. The killing was premeditated.

      4. The defendant was not acting in self-defense.

      5. The defendant is an Indian; and

      6. The offense occurred in Indian Country.

*See* Eighth Circuit Pattern Criminal Jury Instruction 6.18.1111A, modified. The defendant stipulated to the last two elements. The remaining issues which the government was required to prove beyond a reasonable doubt were that defendant intentionally killed the victim, that he did so with malice aforethought, that the killing was premeditated, and that the defendant was not acting in self-defense.

      The evidence admitted at trial showed that, on Tuesday, December 15, 2022, law enforcement conducted a welfare check for Allison Archambault at the request of her family. The family requested law enforcement to check the residence of the defendant with whom Ms. Archambault had a long-standing relationship. When law enforcement arrived at defendant's residence, there was blood on the door and carpet outside the back door of defendant's apartment. Defendant's car was parked in front of the residence of Leslie Confer near the defendant's residence but defendant was not located. The officer contacted tribal housing who let the officer into the defendant's apartment.

      The officer found the body of Ms. Archambault in the kitchen laying face down. There was blood around the body. No weapons were found around the body. EMS was called and she was declared dead.

      BIA law enforcement officers were called to help search for the defendant who was, at that time, a suspect. They went to the home of Leslie Confer. She said she did not believe he was present. She gave consent to search. Defendant was located hiding in the residence behind the door in a bathroom with the lights out.

      The Federal Bureau of Investigation ("F.B.I.") was contacted and conducted a search for evidence at defendant's home. The victim's body was found lying near the back door of the defendant's residence in the kitchen. She was wearing only one shoe.

The other shoe was found at the threshold between the living room and the bedroom. In the defendant's bedroom, a bloody pair of pajama pants were located rolled up on the floor. A cardboard box containing *inter alia*, a handgun magazine, was discovered in the closet. The box was dumped out on the bed and photographed. The victim's cell phone was on the kitchen table with a bloody fingerprint.

Defendant was interviewed at 3:20 a.m. on Wednesday, December 16, 2020, by F.B.I. agents. The interview was recorded and played for the jury.

Defendant stated in that interview that he and the victim were together on Friday, December 11, 2020, and they shopped in Bismarck, North Dakota. On Saturday, December 12, 2020, the defendant and the victim started drinking together about noon at the defendant's apartment. The victim noticed that there were songs recently played on a device signed into YouTube that were not characteristic of defendant's taste in music. They began to argue after the victim learned that her sister had previously been at the defendant's apartment. Defendant claims the victim began throwing things at him, calling him names, hitting him, trying to pull his glasses off, trying to pull his hair, and that she threw his cell phone down. He claimed that she pulled out two knives from a kitchen drawer, one knife in each hand, stating she was going to kill defendant.

Defendant advised agents that he had purchased a .45 caliber Sig Sauer pistol for protection two months prior to the victim's death. The handgun was in the closet in a box unloaded with 2-3 bullets in the magazine clip. Defendant claimed that Ms. Archambault went to the closet to get the handgun and stated she wanted to kill defendant and wanted him to die. She didn't have the firearm loaded but the clip was in her hand. He stated she put the clip in the firearm and cocked it. She told the defendant she hated him and wished he was dead.

Defendant stated during the interview that, as he was standing in front of the sink, they struggled for the gun, pushing each other. He stated that she was facing the back door and he was facing the kitchen. While they were struggling, the gun went off and she fell and dropped in the kitchen by the back door and was unresponsive. He could not tell

where she was shot. She was shot sometime around 5:00 p.m. on Saturday, December 12, 2020.

Defendant stated that, although they were inside the apartment when the firearm discharged, the back door and the screen door were open. He acknowledged that, at some point prior to the victim retrieving the firearm, they had struggled by the back door and outside of the apartment.

Defendant stated that, when Ms. Archambault did not respond, he was scared. He left the apartment with the firearm and drove around. Prior to leaving, he noticed blood on his shirt and changed his shirt. He stayed Saturday night at his cousin's house. At some point he stayed at Leslie Confer's house, where he was found over three days after Ms. Archabault's death.

When F.B.I. agents told defendant that Ms. Archambault was dead, he said he thought she had planned to go to California with her friend and he assumed she had done so. He claimed that his relationship with Ms. Archambault had been abusive and that he was the one always getting hit, always getting scratched, always defending himself, and always blocking himself. He claimed he was acting in self-defense.

Despite defendant's statements about the victim's threatening use of knives, no knives were found out of place in the apartment. Photographs were taken of the defendant but he had no obvious injuries.

Defendant was interviewed by F.B.I. agents a second time on Tuesday, December 22, 2020, one week after the first interview. The interview was recorded and the recording was played for the jury.

Defendant stated in the second interview that Ms. Archambault wanted to know about songs that had been played on defendant's YouTube channel. She had been drinking heavily. She had threatened to kill him several times and held two knives at one point. She went into defendant's bedroom closet and retrieved the firearm. They wrestled for the firearm. He pushed her away, took the gun from her, aimed the gun, and shot her.

4

Apparently one of the agents had talked to the defendant about the difference between premeditated murder and murder in the heat of passion prior to the second interview. That discussion was not recorded. Defendant stated during that second interview that he wanted to make the new statement to distinguish that he had shot Ms. Archambault in the heat of passion.

Defendant stated that, at the time of the shooting, the victim was in the kitchen facing towards the living room and the defendant was standing by the back door, also facing the living room. He asked her why she had gotten the gun. She stated she wanted him dead and threatened to kill him. He took the weapon from her and immediately shot her.

Defendant had, by the time of the second interview, seen the pictures depicting blood outside the back door of his apartment. When agents asked how the blood got outside, defendant stated that, prior to the shooting, they had wrestled and she was bleeding. He stated that he took the firearm from the victim and placed it on the sink. She went outside and was trying to use her phone. He stated he brought her back – escorted her back (in his words) – into the apartment. This occurred 30 seconds before the shooting. He stated that the victim began to say she wanted him dead and wanted to kill him. He grabbed the gun, pushed her to the side, and shot her.

During the trial, a forensic pathologist testified that Ms. Archambault died of a single gunshot wound to the back of her head. Based upon the fact that there was no gunshot residue or stippling on the victim's head, the wound was inflicted from a distance. The victim's body, including the brain, was markedly decomposed so the path of the bullet could not be determined. The bullet did not exit the skull. The victim had areas of bruising on the back of her hand and a knee and also had a scrape on her leg.

Testimony was received at trial that, between the two interviews of the defendant, another consensual search of defendant's home was conducted to look for knives. Two knives were found in a drawer and one on a drying rack.

A DNA expert testified that the blood at the back door of defendant's apartment belonged to the victim. There was blood on the front site of the gun and both male and

5

female DNA on the gun. The female DNA belonged to the victim and the male DNA possibly came from the defendant. There were no fingerprints detected on the firearm or on the knives located in the apartment. Only the defendant's fingerprint was found on one of the magazines.

Testimony was received that, on at least two prior occasions, defendant had become angry at two separate men, accusing them of trying to have a relationship with the victim. There was also evidence, including from the defendant himself, that the victim had intended to go on a trip with one of the men the weekend of her death.

Following the close of the government's evidence, the defendant testified at trial. He stated that he had been in a relationship with Ms. Archambault since 2013. On the day that she died, the victim started arguing with the defendant about who had been at his house. Defendant advised the victim that her sister had been there. Defendant stated that the victim attacked him, accusing him of having sex with her sister. He testified that the victim threatened to kill him and was hitting him. He stated that he tried to hold her away from him. He pushed her and they both fell. His glasses got broken when she knocked them off his face. He testified that she opened a kitchen drawer looking for knives to kill him. They wrestled and ended up outside.

Defendant testified that the victim went to the bedroom closet, grabbed the gun box from the closet, and put the box on the bed. Defendant knew the gun was still in the closet so he grabbed it. He stated that she came to try to grab it from him and they wrestled in the bedroom and living room. He stated that he reached for his car keys and started walking out the back door when she grabbed his hair to pull him back in the apartment.

Defendant stated that, at that time, the gun was in his right hand. He was two steps out the back door when she continued pulling his hair, cussing, and saying she wanted him dead as he was trying to leave. He testified that he turned around and tried to break free from her and the weapon discharged. She fell on the threshold of the back door. All of the foregoing occurred between 5:00 and 6:00 at night.

6

Defendant testified that the victim did not respond to him. He dragged her body from outside the back door where the blood stain was to where she was found in the kitchen so he could close the back door. He locked the back door. He noticed his pajama pants had blood on them so he took those off, put on other pants, and left. He took his dog and drove towards Mobridge. He claimed he did not have a key to get back into the apartment because the victim had previously taken his key to make a duplicate.

Defendant stated that he stayed the night at his dad's residence at Kennel. On Sunday he drove towards Ft. Yates and Bismarck, drove back, and went to Bullhead. He parked at Bear Ridge Hill Sunday night and Monday. On Monday, he stayed at his father's residence at Kennel. On Tuesday he wanted to get into his apartment so he went to his friend Leslie's house. She had a key to his apartment. He testified that Leslie asked for a ride to the grocery store and, while she was inside, the victim's daughter pulled into the parking and asked where her mother was. Defendant told the victim's daughter he was going back to his apartment soon but she left. The victim's daughter testified at trial that, during that conversation, the defendant told her the victim had left town with another man.

### A. Evidence of Intentionally Killing Allison Archambault.

"A jury is free to believe or reject a witness's testimony in part or in whole. The jury is free also to accept one or more witnesses' testimony only in part and thereby to create its own version of the facts." United States v. Fairchild, 819 F.3d 399, 407–08 (8th Cir. 2016) (internal citations omitted). At least one version of defendant's statement concerning the shooting of Allison Archambault was that defendant intentionally aimed the gun and shot her. The jury was free to reject any claim that the gun accidentally fired while the defendant and the victim were wrestling for the gun.

### B. Evidence of Malice Aforethought.

The jury was instructed that the term "malice aforethought means an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life." See Eighth Circuit Pattern Criminal Jury Instructions 6.18.111A-1. Malice aforethought may be proved by

showing "intent at the time of a killing willfully to take the life of a human being or an intent willfully to act in callous and wanton disregard of the consequence of human life." United States v. Johnson, 879 F.2d 331, 334 (8th Cir.1989).

Having found that the defendant voluntarily and intentionally shot the gun and that the shooting was not an accident as a result of a struggle for the gun, the jury could reasonably have determined that, in shooting the victim in the back of the head, it was defendant's intent to take the life of Ms. Archambault. There is no other reasonable view of the evidence in this case. If the jury believed that the gun discharged during a struggle for the gun or while he was holding the gun and was trying to free himself from the victim, the jury could not have found that the discharge was intentional as required under the first element. There is no version of the evidence under which the defendant voluntarily shot Ms. Archambault in the back of the head but did not intend to kill her. If the defendant intended to shoot the victim, it logically follows that he intended to take her life. The jury was free to infer that the defendant intended the natural and probable consequences of voluntarily and intentionally shooting the victim.

### C. Evidence of Premeditation.

The jury was instructed that:

> A killing is premeditated when it is intentional and the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the defendant, after forming the intent to kill, to be fully conscious of his intent, and to have thought about the killing.
>
> For there to be premeditation the defendant must think about the taking of a human life before acting. The amount of time required for premeditation cannot be arbitrarily fixed. The time required varies as the minds and temperaments of people differ and according to the surrounding circumstances in which they may be placed. Any interval of time between forming the intent to kill, and acting on that intent, which is long enough for the defendant to be fully conscious and mindful of what he intended and willfully set about to do, is sufficient to justify the finding of premeditation.

*See* Eighth Circuit Model Criminal Jury Instruction 6.18.1111A-2, United States v. Thomas, 664 F.3d 217, 223 (8th Cir. 2011).

There is direct evidence supporting the element of premeditation. The jury could have reasonably concluded that defendant's conduct was premeditated when he purchased the gun close in time to the offense, the offense happened after defendant twice demonstrated jealousy arising out of the victim's interaction with other men, when he retrieved the gun from the closet, and in the moment before he pulled the trigger. United States v. Thomas, 664 F.3d at 224. Further, premeditation can be proved by circumstantial evidence.

> Three categories of evidence are important for this purpose: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, Planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which Motive may be inferred; and (3) facts about the Nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

United States v. Dale, 614 F.3d 942, 963 (8th Cir. 2010) (*quoting* United States v. Blue Thunder, 604 F.2d 550, 553 (8th Cir. 1979)) (capitalized emphasis in original).

The evidence in this case showed that the defendant and the victim's relationship was fraught with violence, that the victim had previously gone on trips with another man, that on a previous occasion the defendant jealously confronted that man, and that the victim intended to go on a trip with that man the weekend of her death. The defendant had lived at his apartment for many years but only purchased a gun, at most, two months prior to the shooting. After the shooting, it was clear that the victim was unresponsive. The defendant left her decaying body in his apartment for several days. He did nothing to summon aid for her. He did not call authorities to report the shooting. He told no person about the shooting. When initially questioned about the shooting, he claimed it was an accident that occurred in the kitchen. After being confronted with evidence of the amount of blood outside the back door of the residence, showing that the shooting took place outside the residence and the victim was moved inside the residence, the defendant claimed the shooting was done in the heat of passion. At trial, after being confronted with evidence that the victim's fingerprints were not on the gun or the magazine, defendant changed his original two stories about the victim retrieving the gun and instead

9

claimed that the victim had tried to retrieve the gun but was mistaken about the gun's presence in a box.

The jury was free to infer from the defendant's changing story to conform to the evidence, together with the fact that the victim appeared to have been shot outside the residence in the back of the head while leaving with her phone in hand, that the defendant shot her with premeditation. Proof of premeditation does "not require the government to show that the defendant deliberated for any particular length of time." United States v. Slader, 791 F.2d 655, 657 (8th Cir.1986).

### D. Evidence of Lack of Self-Defense.

Defendant's statement before trial and at trial are rife with claims that the defendant and the victim were arguing and that the victim was angry with the defendant. He claimed that she pulled his hair, made statements that she was going to kill him and wanted him dead, threatened him with knives, and went to retrieve his gun while making threats to kill him. None of those matters support his claim of self-defense. If, as he once claimed, the gun went off while they were wrestling for the gun or while he was trying to free himself from the victim, the gun was not discharged in self-defense. The jury of course rejected the accidental discharge theory. The defendant's second statement to authorities showed that the defendant shot the victim when she did not have a weapon and was not in a position to kill him.

Some of the defendant's statements were to the effect that the shooting was accidental. Other evidence showed that the shooting amounted to an execution. Neither supports a theory of self-defense. The jury could reasonably have rejected defendant's claim that he was acting in self-defense at the time of the killing.

## II. Motion for a New Trial.

Fed. R. Crim. P. 33(a) provides that a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." The Eighth Circuit has held that "Rule 33 motions are disfavored and a district court must exercise Rule 33 authority sparingly and with caution." United States v. Broeker, 27 F.4th at 1335 (cleaned up). "Granting such motions 'is reserved for exceptional cases in which the evidence

preponderates heavily against the verdict.'" United States v. Iron Crow, 970 F.3d 1003, 1010 (8th Cir. 2020) (*quoting* United States v. Stacks, 821 F.3d 1038, 1045 (8th Cir. 2016)). This is not the exceptional case where the evidence preponderates against the verdict.

My discretion under Rule 33 is quite broad - I "can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." White v. Pence, 961 F.2d 776, 780 (8th Cir.1992). However, I must allow the verdict to stand unless I find that a miscarriage of justice has occurred. United States v. Lacey, 219 F.3d 779, 783 (8th Cir.2000). I do not so find.

### A. Failure to Instruct on Self-Defense Burden of Proof.

Defendant contends that he is entitled to a new trial because I erred in my instructions on the burden of proof as to self-defense. As set forth previously, there was no evidence to support that, at the time of the discharge of the gun, the defendant was acting in self-defense.

The defendant's contention that the jury instructions failed to properly advise the jury as to burden of proof is false. In Instruction No. 3, the jury was instructed that the presumption that the defendant is innocent can only be overcome if the government proves each essential element beyond a reasonable doubt. In Instruction No. 10, the jury was instructed that the government must prove beyond a reasonable doubt all the elements of first-degree murder, including that the defendant was not acting in self-defense. Each of the lesser-included offense instructions, which were read to the jury, included the same admonition as to the element of self-defense.

### B. Failure to Instruct on Involuntary Manslaughter.

Defendant contends that he is entitled to a new trial because I failed to instruct on the lesser-included offense of involuntary manslaughter. He contends that such an instruction was supported by his "imperfect self-defense" theory of defense. "The defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the

11

greater." United States v. Parker, 993 F.3d 595, 604 (8th Cir. 2021) (*quoting* United States v. Ziesman, 409 F.3d 941, 949 (8th Cir. 2005).

Involuntary manslaughter under 18 U.S.C. § 1112(a) is "the unlawful killing of a human being without malice . . . [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." United States v. Lasley, 832 F.3d 910, 913 (8th Cir. 2016). Defendant's new theory in support of his Rule 33 motion for a new trial is that he may have unreasonably believed deadly force was necessary to defend himself or that he inadvertently caused the victim's death while defending himself in a criminally negligent manner.

The Court instructed on self-defense out of an abundance of caution. There was no evidence presented by defendant at trial or by the government in the two prior recorded interviews of the defendant that, at the time of the discharge of the gun, the victim was about to inflict unlawful physical harm upon the defendant. Defendant, in his own sworn testimony at trial, reiterated his claim that the gun accidentally discharged during a scuffle with the victim. His theory of defense at trial was that the killing was accidental. There was no version of the evidence to support an instruction that defendant was merely criminally negligent in causing the victim's death.

**ORDER**

Based upon the foregoing,

IT IS ORDERED that defendant's motion, Doc. 88, for a judgment of acquittal or for a new trial is denied.

DATED this 8th day of November 2022.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge